THE STATE EX REL. OHIO CONGRESS OF PARENTS & TEACHERS ET AL., APPELLANTS AND CROSS-APPELLEES, *v.* STATE BOARD OF EDUCATION ET AL., APPELLEES AND CROSS-APPELLANTS.

[Cite as *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.,* 111 Ohio St.3d 568, 2006-Ohio-5512.]

(No. 2004–1668—Submitted November 29, 2005—Decided October 25, 2006.)

LANZINGER, J.

{¶ 1} In this action, while recognizing that the challengers retain their ability to litigate alleged statutory violations against particular schools, we hold that community schools, also known as "charter schools," in and of themselves, are not unconstitutional. The appellants and cross-appellees are the Ohio Federation of Teachers, the Ohio Congress of Parents and Teachers, the Ohio School Boards Association, other education associations and teachers' unions, certain parents, taxpayers, school district boards of education, and residents of various school districts ("appellants"). Their lawsuit challenges the constitutionality of laws for the establishment and operation of Ohio's community schools enacted by the General Assembly by Am.Sub.H.B. No. 215 in 1997 and codified at R.C. Chapter 3314.[1]

{¶ 2} The appellees and cross-appellants include the State Board of Education, Ohio's Superintendent of Public Instruction, the Ohio Department of Education, various Ohio community schools, Ohio community-school operators, and White Hat Management, L.L.C., a company that manages 28 community schools in the state ("appellees").

---

1. We acknowledge the amicus briefs filed in this matter.

{¶ 3} The parties filed jurisdictional memoranda asking us to accept this case as a discretionary appeal to determine the constitutionality of R.C. Chapter 3314. We accepted the appeal and the cross-appeals solely to determine the constitutional issues. Appellants' charges regarding the establishment and operation of community schools are still pending at the trial court.

{¶ 4} After first providing an overview of the enabling legislation and the history of this case, this opinion will analyze the constitutional claims arising under the Ohio Constitution, specifically (1) Section 2, Article VI, the Thorough and Efficient Clause, (2) Section 3, Article VI, governing city school districts, (3) Section 5, Article XII, limiting proceeds of taxes to their stated purposes, and (4) Sections 4 and 5, Article VIII, restricting the lending of the state's credit and the state's assumption of debt.

## I. Overview of the Community–Schools Act, R.C. Chapter 3314

{¶ 5} Ohio adopted charter-school legislation when the Ohio General Assembly enacted R.C. Chapter 3314 in 1997. Am.Sub.H.B. No. 215, 147 Ohio Laws, Part I, 909, 1187. As legislatively created, community schools are independently governed public schools that are funded from state revenues pursuant to R.C. Chapter 3314.

{¶ 6} In enacting R.C. Chapter 3314, the General Assembly declared that its purposes included "providing parents a choice of academic environments for their children and providing the education community with the opportunity to establish limited experimental educational programs in a deregulated setting." Am.Sub. H.B. No. 215, Section 50.52, Subsection 2(B), 147 Ohio Laws, Part I, 2043. Community schools are permitted to target and tailor programs for small student populations such as learning-disabled students or dropouts from traditional schools. R.C. 3314.06(B), 3314.03(A)(2), and 3314.04.

{¶ 7} The General Assembly explained that "[a] community school created under this chapter is a public school, independent of any school district, and is part of the state's program of education." R.C. 3314.01(B). Community schools are state-funded, R.C. 3314.08(D), but each is privately run, R.C. 3314.01 and 3314.02(B) and (C)(1). Each community school must be formed as either a nonprofit corporation or a public-benefit corporation. R.C. 3314.03(A)(1). Community schools cannot charge tuition, R.C. 3314.08(I), and must be nonsectarian, R.C. 3314.03(A)(11)(c), with enrollment policies that comply with R.C. 3314.06. While community schools are exempt from certain state laws and regulations, R.C. 3314.04, they must comply with many of the same statewide academic standards, R.C. 3314.03(A)(11). Community schools contract with sponsors, which are responsible for monitoring their performance and compliance with applicable standards and requirements. R.C. 3314.03(A)(4). In turn, sponsors

are monitored and overseen by the Ohio Department of Education ("ODE"). R.C. 3314.015.

{¶ 8} Formerly, sponsors were required to be public entities (i.e., local boards of education, the ODE, educational service centers, or trustees of universities or their designees). Former R.C. 3314.02(A)(1) and (C)(1), 1999 Am.Sub.H.B. No. 282, 148 Ohio Laws, Part I, 2022–2023. Since April 8, 2003, certain other approved, nonprofit, education-oriented entities may also be sponsors. R.C. 3314.02(C)(1)(f), 2002 Sub.H.B. No. 364, 149 Ohio Laws, Part V, 10,208 and 10,210. Under R.C. 3314.015(A), the ODE must approve sponsors, monitor the effectiveness of their oversight of their schools, and issue reports on the effectiveness of the schools' academic programs, operations, and legal compliance and on their financial condition. Sponsors must seek ODE approval, according to criteria, procedures, and deadlines established by ODE. R.C. 3314.015(B). If a sponsor becomes unwilling or unable to complete its duties, ODE may revoke approval to act as a sponsor and assume direct sponsorship of the community school in question for up to two years. R.C. 3314.015(C).

{¶ 9} Each community school is governed by a contract between the governing authority of the school and its sponsor. R.C. 3314.03. The initial contract term may last no more than five years. R.C. 3314.03(A)(13). If the school does not meet its contract objectives, the sponsor may choose not to renew the contract. Alternatively, the sponsor may terminate the contract for good cause before the end of the contract's term. R.C. 3314.07.

{¶ 10} Ohio is not alone in adopting charter-school legislation. As of 1992 a majority of states allow for the creation of charter schools, typically allowing those schools to use a per-pupil funding stream from government sources (either state or local) to pay for the schools. With the increasing prevalence of charter schools has come increased statutory oversight and regulation, especially for licensing, regulatory inspections, and academic testing. 50 State Statutory Survey, "Charter School Licensing Requirements, Inspections, and Testing" (2006). R.C. Chapter 3314 has been amended frequently since it was enacted,[2] and the law governing community schools continues to evolve.

---

2. Revisions to R.C. Chapter 3314 have included Am.Sub.S.B. No. 55, 147 Ohio Laws, Part III, 6542, 6567, which expanded the ability to create community schools; Am.Sub.H.B. No. 770, 147 Ohio Laws, Part III, 5609, 5638, which extended the maximum term of sponsorship contracts from three to five years; Am.Sub.H.B. No. 282, 148 Ohio Laws, Part I, 1956, 2020, which changed certain features of community schools, requiring them to have fiscal officers and requiring the ODE to issue an annual report card for each school; Am.Sub.H.B. No. 94, 149 Ohio Laws, Part III, 4126, 4555, which created a loan-guarantee program; 2002 Sub.H.B. No. 364, which made the ODE responsible for the oversight and approval of sponsors. This list is not comprehensive, but serves to show some of the amendments to charter-school legislation.

## II. Procedural History of Case

{¶ 11} The appellants filed suit on May 14, 2001, requesting declaratory and injunctive relief and writs of mandamus, raising several constitutional challenges to various aspects of R.C. Chapter 3314. The appellants filed a third amended complaint asserting ten different claims, including several as bases for the trial court to issue a declaratory judgment stating that R.C. Chapter 3314 is unconstitutional on its face and as applied.

{¶ 12} At a status conference on November 9, 2001, the trial judge bifurcated the litigation to reduce the potential burden on the parties. In the first phase, they were to focus solely on legal issues that could be decided without discovery—these issues relate to the constitutional challenges to Ohio's community-school program. In the second phase, which is still pending, the trial court will examine the factual claims that address compliance with statutes and with sponsorship contracts. As already noted, the first phase is the subject of the parties' discretionary appeal and cross-appeals, which we accepted solely to decide the constitutional challenges.[3]

{¶ 13} On May 20, 2002, several motions were filed: (1) the appellants filed motions for summary judgment on counts four, five, seven, eight, nine, and ten, (2) the state appellees filed a motion to dismiss the third amended complaint and for summary judgment, (3) the community-school appellees filed a motion for judgment on the pleadings on counts three, four, five, six, seven, and eight, and (4) White Hat filed a motion for judgment on the pleadings. The trial court identified counts four, five, six, and seven of the third amended complaint as the legal claims to be resolved based on the pleadings and motions filed by the parties.

{¶ 14} In its decision, the trial court first considered count four of the third amended complaint. This count is a facial challenge to R.C. Chapter 3314, alleging that the statute violates both Section 3, Article VI and Section 5, Article XII of the Ohio Constitution, sections that deal with the powers of city school boards and restrictions on the use of tax revenue. Count four contains two underlying claims. First, the appellants allege that Section 3, Article VI has been violated because R.C. Chapter 3314 has "usurped this constitutional right of local educational self-determination by allowing the creation of privately owned

---

3. Had we waited to consider all issues as Justice O'Donnell suggests, the parties would have been back before this court later, with most of the same claims. (The court of appeals remanded most of the claims but affirmed the dismissal of two. If we had not accepted review of that appellate decision or if we dismissed the case now, the decision on those claims would remain standing as res judicata, and those claims would not be subject to further litigation on remand or a subsequent appeal.) The constitutional issues have been joined and have been fully briefed. With respect to those legal issues, there is no fact-finding to be done.

'community schools' not authorized or governed by locally elected school boards." The trial court disagreed and held that the General Assembly has the power to create and modify school districts as it believes necessary, without the approval of the school districts. Second, the appellants claim that the method of funding community schools violates Section 5, Article XII of the Constitution by in effect diverting local tax dollars to community schools. The trial court disagreed again and found that the appellants "cannot show a diversion of local tax levies to community schools in violation of Section 5, Article XII of the Ohio Constitution."

{¶ 15} Counts five and six are challenges to R.C. Chapter 3314 on its face and as applied. In these counts, the appellants allege that community schools violate Section 2, Article VI of the Ohio Constitution, the Thorough and Efficient Clause. The appellants argue that community schools are not part of the thorough and efficient system of common schools, because they have been allowed to operate with different standards. They also claim that the manner in which community schools are funded takes money away from traditional school districts, making them less thorough and efficient. The trial court found these claims barred by res judicata because *DeRolph v. State* (2002), 97 Ohio St.3d 434, 2002-Ohio-6750, 780 N.E.2d 529, had determined already that the public school system, of which community schools are part, is not constitutionally thorough and efficient.

{¶ 16} Count seven alleges that R.C. 3314.08(J), 3318.50, and 3318.52 violate Sections 4 and 5, Article VIII, which restrict the lending of the state's credit and the state's assumption of debt. The statutory provisions at issue under this count allow community schools to borrow money in anticipation of state payments and to receive state-guaranteed loans for buildings and other facilities. Because community schools are organized for a public purpose (educating children), the trial court found that R.C. 3314.08(J), 3318.50, and 3318.52 permit community schools to borrow money and the state to guarantee loans without constitutional violation.

{¶ 17} The trial court granted the state appellees' motion to dismiss, the community-school appellees' motion for judgment on the pleadings, and White Hat's motion for judgment on the pleadings on counts four through seven. The trial court denied appellants' motion for partial summary judgment.

{¶ 18} The Court of Appeals for Franklin County agreed with the trial court on count four that the General Assembly's exercise of its broad power to create, change, or modify the state's school districts does not impinge on Section 3, Article VI. However, the court disagreed with the decision to dismiss the portion of count four that implicates Section 5, Article XII, the constitutional provision that requires that local levy funds go to their intended purpose. The court of appeals found that the appellants' claim that the method of funding community schools diverts state funds from local school districts raises issues of fact.

Accordingly, the court remanded this claim, as well as counts five, six, and seven.[4] Both sides filed jurisdictional memoranda asking this court to address the legal merits of all of appellants' constitutional claims. We accepted all propositions of law (except the proposition addressing the res judicata effects of *DeRolph*).

## III. Legal Analysis

### A. Summary of Constitutional Claims

{¶ 19} The complaint in this case asserted that numerous constitutional provisions were implicated in this case, so we will first summarize the constitutional provisions and the relevant standards of proof before analyzing each claim in turn. We are asked to determine whether R.C. Chapter 3314 violates Section 2, Article VI, which contains the Thorough and Efficient Clause; Section 3, Article VI, which governs the organization of city school districts; Section 5, Article XII, which limits tax proceeds to their stated purposes; and Sections 4 and 5, Article VIII, which restricts the state's lending of credit and assumption of debt.[5]

### B. Standard of Proof

{¶ 20} Initially, we must acknowledge that legislative enactments are entitled to a strong presumption of constitutionality. *N. Ohio Patrolmen's Benevolent Assn. v. Parma* (1980), 61 Ohio St.2d 375, 377, 15 O.O.3d 450, 402 N.E.2d 519. When the constitutionality of legislation is attacked, we must interpret the applicable constitutional provisions and acknowledge that "a court has nothing to do with the policy or wisdom of a statute. That is the exclusive concern of the legislative branch of the government. When the validity of a statute is challenged on constitutional grounds, the sole function of the court is to determine whether it transcends the limits of legislative power." *State ex rel. Bishop v. Mt. Orab Village School Dist. Bd. of Edn.* (1942), 139 Ohio St. 427, 438, 22 O.O. 494, 40 N.E.2d 913. A statute should not be declared unconstitutional "unless it 'appear[s] beyond a reasonable doubt that the legislation and constitutional provision are clearly incompatible.' " *Kelleys Island Caddy Shack, Inc. v. Zaino*, 96 Ohio St.3d 375, 2002-Ohio-4930, 775 N.E.2d 489, ¶ 10, quoting *State ex rel.*

---

4. The court of appeals determined that res judicata did not bar litigation of counts 5 and 6 and remanded these counts to the trial court for further proceedings. The court of appeals also remanded count seven, advising that the trial court may at the same time examine the issues in this count, even if only as a part of the remaining claims.

5. Other states, like Michigan, California, Utah, and New Jersey, have considered similar claims under similar constitutional provisions and have rejected them. *Council of Orgs. & Others for Edn. about Parochiaid, Inc. v. Engler* (1997), 455 Mich. 557, 566 N.W.2d 208; *Wilson v. State Bd. of Edn.* (1999), 75 Cal.App.4th 1125, 89 Cal.Rptr.2d 745; *Utah School Bds. Assn. v. Utah State Bd. of Edn.* (Utah 2001), 17 P.3d 1125, 1129, 1131; and *In re Grant of Charter School Application of Englewood on the Palisades Charter School* (2000), 164 N.J. 316, 753 A.2d 687.

*Dickman v. Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, paragraph one of the syllabus. Furthermore, a statute "must be enforced unless it is in clear and irreconcilable conflict with some express provision of the constitution." *Spivey v. Ohio* (N.D.Ohio 1998), 999 F.Supp. 987, 999. Thus, in reviewing these constitutional claims, we must give due deference to the General Assembly. But this still means, of course, that we must conduct an independent review.

{¶ 21} The constitutional challenges to the statutes involve facial challenges as well as challenges to the application of R.C. Chapter 3314. The two types of challenges require different standards of proof. To prevail on a facial constitutional challenge, the challenger must prove the constitutional defect, using the highest standard of proof, which is also used in criminal cases, proof beyond a reasonable doubt. *State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, paragraph one of the syllabus. To prevail on a constitutional challenge to the statute as applied, the challenger must present clear and convincing evidence of the statute's constitutional defect. *Belden v. Union Cent. Life Ins. Co.* (1944), 143 Ohio St. 329, 28 O.O. 295, 55 N.E.2d 629, paragraph six of the syllabus. " 'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *Lansdowne v. Beacon Journal Publishing Co.* (1987), 32 Ohio St.3d 176, 180–181, 512 N.E.2d 979, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus.

{¶ 22} With this background in mind, we turn to the appellants' specific claims.

## C. Counts Five and Six: The "common schools" argument

### 1. Introduction

{¶ 23} Because counts five and six both implicate the Thorough and Efficient Clause of the Ohio Constitution, we will discuss both counts in this section. The appellants claim that R.C. Chapter 3314, the Ohio Community–Schools Act, violates the Thorough and Efficient Clause of Section 2, Article VI of the Ohio Constitution. Section 2 provides:

{¶ 24} "The General Assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the state * * *."

{¶ 25} The appellants argue in count five that community schools violate the Thorough and Efficient Clause because they are not part of the system of common schools, being publicly funded but privately owned and not subject to

uniform statewide standards. Count six provides the second part of their argument, asserting that because community schools are state-funded, they have diverted money from local school districts, thus depriving the districts of the ability to provide a thorough and efficient educational system. Both claims allege that the statutes, as applied, are unconstitutional. Thus, the appellants must present clear and convincing evidence of the statutes' constitutional defect. *Belden v. Union Cent. Life Ins. Co.*, 143 Ohio St. 329, 28 O.O. 295, 55 N.E.2d 629.

{¶ 26} In response to the argument that community schools are unconstitutional because they are privately owned and subject to different standards, the appellees contend that the General Assembly is authorized by the Thorough and Efficient Clause to create community schools as part of Ohio's system of common schools. The appellees maintain that community schools do not have to be owned or operated by the public to be part of the common-school system. Community schools have been declared to be "public schools, independent of any school district, and * * * part of the state's program of education." R.C. 3314.01(B). Furthermore, the appellees assert that because the term "common schools" is not defined in the Constitution, and because there is no constitutional requirement that all public schools must be governmentally owned and operated, the General Assembly should be allowed to determine the requirements of "common schools."

## 2. Count Five: Different standards for schools under private ownership

{¶ 27} Throughout time, new educational movements have faced opponents and detractors. But just as the common-school movement of the 1800s increasingly gained supporters throughout the United States, so too has the charter-school movement.

{¶ 28} The Thorough and Efficient Clause was adopted at the 1851 Constitutional Convention, largely in response to the common-school movement. Before Section 2, Article VI was adopted, Ohio had officially encouraged, but had not required, education. Section 3, Article VIII, Ohio Constitution of 1802. Originally, "[s]chools received no public aid except through revenues from lands set aside by Congress for the purpose in the Northwest Territory. * * * Early Ohio schools were private, organized by individual schoolmasters, a group of neighbors, a church, or a charitable society. Some were free, but many charged tuition in addition to receiving a share of the school lands revenue * * *." Editor's Comment to Section 2, Article VI, in Baldwin's Ohio Revised Code Annotated (2004). The common-school movement, originating in Massachusetts through the work of Horace Mann, held the basic ideology that all citizens should have "a common foundation of literacy, morality, and patriotism, regardless of their origins, through free public schools supported by taxes, with compulsory school attendance and supervision at the state level." Id. Common schools were highly controversial at first, but gained wide acceptance after 1841. By 1851, the

common-school movement had wide support in Ohio, leading to the adoption of the Thorough and Efficient Clause. Id.

{¶ 29} As early as 1923, this court had the opportunity to interpret this clause and to set forth a standard for evaluating a thorough and efficient system of common schools. *Miller v. Korns* (1923), 107 Ohio St. 287, 140 N.E. 773. We recognized that the purpose of providing a thorough and efficient system was statewide in nature and "[w]ith this very state purpose in view, regarding the problem as a state-wide problem, the sovereign people made it mandatory upon the General Assembly to secure not merely a system of common schools, but a system thorough and efficient throughout the state." Id. at 297–298, 140 N.E. 773. Furthermore, in *DeRolph v. State,* Chief Justice Moyer noted that "our Constitution commits the responsibility for ascribing meaning to the phrase 'thorough and efficient' to the General Assembly and not to this court." *DeRolph v. State* (1997), 78 Ohio St.3d 193, at 264, 677 N.E.2d 733, 747 (Moyer, C.J., dissenting). As the statewide body, the General Assembly has the legislative authority and latitude to set the standards and requirements for common schools, including different standards for community schools. In fulfilling its governmental role, it must still function according to its constitutional directive.

{¶ 30} In enacting community-school legislation, the General Assembly added to the traditional school system by providing for statewide schools that have more flexibility in their operation. Community schools were designed to give parents a choice and give educators "the opportunity to establish limited experimental educational programs in a deregulated setting." 1997 Am.Sub.H.B. No. 215, Section 50.52, Subsection 2(B), 147 Ohio Laws, Part I, 2043. Deregulation implies exemption, and while it is true that community schools are exempted from certain state standards,[6] there are others to which the schools must also adhere. Community school students must pass the same graduation test that students in traditional public schools must pass. R.C. 3314.03(A)(11)(f). Community schools must administer proficiency and achievement tests, R.C. 3314.03(A)(11)(d), and diagnostic tests, R.C. 3314.03(A)(3), maintain adequate facilities and meet all health and safety standards, R.C. 3314.05, and comply with numerous Revised Code sections as if they were school districts, R.C. 3314.03(A)(11)(d). (See Appendix A for additional requirements from which community schools are *not* exempt.) Community-school sponsors are monitored and supervised by the ODE, the same department that oversees traditional public schools. R.C.

---

6. R.C. 3314.04 exempts community schools from most state laws and regulations dealing with public schools except the state laws that grant certain rights to parents and laws specified in the sponsor contract and in R.C. Chapter 3314 itself. See Appendix A for a list of those laws that community schools must still comply with.

3314.015. Although Justice Resnick's dissent focuses on the requirements that community schools are exempted from, upon closer examination, many of these exemptions are picayune in nature.

{¶ 31} The Ohio Community–Schools Act was drafted with the intent that parental choice and sponsor control would hold community schools accountable, in a fashion similar to traditional school management. In exchange for enhanced flexibility, community schools face heightened accountability to parents and sponsors. Either can threaten shutdown, sponsors by suspending operations pursuant to R.C. 3314.072, and parents by withdrawing their children. In fact, internet- or computer-based community schools lose their funding if they do not show expected gains for two years, and any community school will be permanently shut down if it fails to meet expected goals for three years. R.C. 3314.36. Traditional schools, on the other hand, may not be shut down no matter how poorly they perform (although they will face decreased funding). R.C. 3302.04(F). Because community schools may serve a targeted student population, their requirements may be more narrowly tailored. This idea is not totally new to Ohio's system of education. In the past, for example, the General Assembly has permitted different requirements for vocational education and special education and has allowed traditional schools to establish magnet schools and specialized schools in arts and science. The General Assembly's statutory scheme sets forth a framework, in keeping with its constitutional directive, for alternative accountability and academic standards for community schools.

{¶ 32} Contrary to Justice Resnick's statement in dissent, we do not approve of just "any schooling arrangement." ¶ 82. The Ohio Constitution requires establishment of a system of common schools. This requirement is grounded in the state's interest in ensuring that all children receive an adequate education that complies with the Thorough and Efficient Clause. To achieve the goal of improving and customizing public education programs, the General Assembly has augmented the state's public school system with public community schools. The expressed legislative intent is to provide a chance of educational success for students who may be better served in their educational needs in alternative settings. Requiring community schools to be operated just like traditional public schools would extinguish the experimental spirit behind R.C. Chapter 3314.

{¶ 33} While the wide discretion granted to the General Assembly is not without limits, *Cincinnati City School Dist. Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 387, 12 O.O.3d 327, 390 N.E.2d 813, we hold that the General Assembly has not transgressed the limits of its legislative power so as to render R.C. Chapter 3314 unconstitutional under the Thorough and Efficient Clause. Over time, the General Assembly has increased the number of state requirements with

which community schools must comply,[7] and has also enacted additional, specific, and unique requirements such as control and oversight by sponsors, R.C. 3314.03, mandated forms of entity status, R.C. 3314.03(A)(1), and annual reporting requirements on fiscal, operational, and academic issues, R.C. 3314.03(A)(11)(g) and 3314.03(D).

{¶ 34} The General Assembly is the branch of state government charged by the Ohio Constitution with making educational policy choices for the education of our state's children. Our personal choices are not relevant to this task. The appellants have not shown beyond a reasonable doubt that the statute is unconstitutional on its face; nor have they met their high burden of presenting clear and convincing evidence of the statute's unconstitutionality as applied. We hold that the General Assembly has the authority to set the standards and requirements for a system of common schools. In providing for community schools within that system, the state legislature has not exceeded its powers.

### 3. Count Six : Funding community schools and a thorough and efficient system

{¶ 35} Count six of the complaint alleges that the funding method used to support community schools diverts funds from city school districts, depriving them of the ability to provide a thorough and efficient system of common schools. Once again, as this claim is a constitutional challenge to R.C. Chapter 3314 as applied, the appellants must present clear and convincing evidence that R.C. Chapter 3314 is unconstitutional. State v. Renalist, Inc. (1978), 56 Ohio St.2d 276, 279, 10 O.O.3d 408, 383 N.E.2d 892.

{¶ 36} Appellants argue that the community schools have made urban districts more reliant on local property taxes because when a student leaves a district for a community school, the state reduces the state funding that the district receives for the student. Nothing in the Constitution, however, prohibits the General Assembly from reducing funding because a school district's enrollment decreases. If a child moves out of the district altogether, the state is permitted to reduce its funding to that child's district because state money follows the child. For example, if a child leaves a school district to attend private school, or to be schooled at home, the state is required to reduce its funding to that district.[8] The same thing occurs when a child opts to attend a community school. R.C. 3314.08. Whenever a student leaves, for any reason, the school district's funding is decreased, and the district continues to receive state funding based on the

---

7. Compare R.C. 3314.03(A)(11)(d) with the original 1997 version in Am.Sub.H.B. No. 215, 147 Ohio Laws, Part I, 1190.

8. State funding of school districts depends on enrollment. R.C. 3317.022 and 3317.03.

students actually attending. Traditional schools still receive the full amount of state funds for the actual number of students enrolled.

{¶ 37} The state adjusts its level of funding to a school district based on enrollment, but the local share works differently, as a constant. The local share of funding remains the same no matter who attends the district school. If district enrollment decreases, the local share, being constant, constitutes a higher percentage of district funding. On the other hand, if district enrollment increases, the local share constitutes a lower percentage of district funding. In dissent, Justice Pfeifer argues that community schools unconstitutionally increase reliance on local funding for district schools, invoking *DeRolph v. State*. The dissent's citation of *DeRolph* is a red herring. *DeRolph* focused on R.C. Chapter 3317, the School Foundation Program, for the allocation of state basic aid. The School Foundation Program conditioned the receipt of state aid on the levy of local property tax revenues. R.C. 3317.01(A). What the *DeRolph* majority found so egregious was Ohio's public schools' heavy dependence upon local property taxes for their support. That simply is not the case here. Community schools do not rely on local property taxes, as they are funded entirely by the state, under an entirely different formula, set forth in a different statute. Community schools cannot levy or spend local taxes. Furthermore, Ohio's traditional school system is not made more reliant on local taxes because of community schools. The state treats community-school students in the same way it has treated any student who has ever left a school district. It reduces its per-pupil funding to the school district, just as it does when students leave for private schools, for other school districts, or for home schooling.

{¶ 38} The mere increase or decrease in the local share *percentage* does not violate the Thorough and Efficient Clause, because the district still receives state funding for the children actually attending the district traditional schools. Community schools never receive any local tax money. In fact, the Legislative Office of Education Oversight stated that "it should be clarified that community schools do *not* take locally-generated tax dollars away from districts * * *." (Emphasis sic.) LOEO, Community Schools in Ohio: Second–Year Implementation Report, Volume I: Policy Issues (Apr. 2001) 27. It explained that "[o]nce the local share is subtracted from the total base cost funding, the state is responsible for providing any amount thereafter." In other words, the state still fulfills its obligation to fund each student at a specific level according to the statutory formula.

{¶ 39} Section 2, Article VI expressly provides that the General Assembly shall make provisions to secure a thorough and efficient system of common schools. The General Assembly has the exclusive authority to spend tax revenues to further a statewide system of schools compatible with the Constitution. Exercis-

ing its discretion, the General Assembly made provisions for community schools when it directed that the state would be the sole source of funding for community schools for their base formula amounts. R.C. 3314.08. Community schools cannot levy local taxes or charge tuition. R.C. 3314.08(H) and (I). When a student leaves a traditional school to attend a community school, the state funds follow the student. Accordingly, we find that R.C. Chapter 3314, as applied, is constitutional. The appellants have not presented clear and convincing evidence that community schools are raiding local funds that school districts are otherwise entitled to receive.

{¶ 40} The next claim that we will examine contains two constitutional provisions: one dealing with the authority of city school boards, and the other with the levy of local taxes.

**D. Count Four: Section 3, Article VI and Section 5, Article XII authority of city school boards and diversion of local tax money**

{¶ 41} Count four of the third amended complaint is a facial challenge to the statutes, claiming that R.C. Chapter 3314 violates local citizens' rights under Section 3, Article VI because community schools within city school districts are not under the control of local voters or of school boards. Count four also contends that the statute offends Section 5, Article XII because local tax dollars are in effect diverted to community schools. To overcome the presumption of constitutionality, the appellants must prove that the statute is unconstitutional beyond a reasonable doubt, the highest standard of proof. *State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, paragraph one of the syllabus.

*1. Authority of city school boards*

{¶ 42} Section 3, Article VI of the Ohio Constitution provides:

{¶ 43} "Provision shall be made by law for the organization, administration and control of the public school system of the state supported by public funds: provided, that each school district embraced wholly or in part within any city shall have the power by referendum vote to determine for itself the number of members and the organization of the district board of education, and provision shall be made by law for the exercise of this power by such school districts."

{¶ 44} Under R.C. 3314.01(B), a community school is a "public school, independent of any school district." The appellants argue that citizens of cities have the exclusive right to exercise authority over public education through the election of school boards and approval of local school tax levies, and because community schools are not authorized or governed by city school boards, this constitutional right of local educational self-determination is usurped.

{¶ 45} This court has held that the General Assembly has the power to create and modify school districts. In *State ex rel. Core v. Green* (1953), 160 Ohio St. 175, 51 O.O. 442, 115 N.E.2d 157, the court stated, "The General Assembly has the power to provide for the creation of school districts, for changes and modifications thereof, and for the methods by which changes and modifications may be accomplished." Id. at paragraph two of the syllabus. An Ohio federal court recognized the General Assembly's authority to provide for the modification of school districts when it approved the creation of a new classification of school districts called "municipal school districts." *Spivey v. Ohio*, 999 F.Supp. at 997. In *Spivey*, the legislation under review gave the mayor of Cleveland authority to appoint members of the Cleveland City School District Board of Education, and local voters were not given the opportunity to preapprove any changes in the school board. R.C. 3311.71 et seq.

{¶ 46} In analyzing this specific issue in the case before us, the Court of Appeals for Franklin County opined that the plain language of Section 3, Article VI "does not give those [local] voters more power than the General Assembly to create policy and organize and administer a system of public education throughout the state." 2004-Ohio-4421, ¶ 39. We agree with this statement.

{¶ 47} Voters in city school districts have the right to vote on the number of members and the organization of their city school boards. In turn, the school boards have authority over the districts they are elected to serve. Section 3, Article IV governs questions of size and organization, not the power and authority, of city school boards. In *Marion Local School Dist. Bd. of Edn. v. Marion Cty. Bd. of Edn.* (1958), 167 Ohio St. 543, 545, 5 O.O.2d 216, 150 N.E.2d 407, this court held that "[b]oards of education have only such powers as are conferred by statute." A board of education is "a mere instrumentality of the state to accomplish its purpose in establishing and carrying forward a system of common schools throughout the state." *Cincinnati Bd. of Edn. v. Volk* (1905), 72 Ohio St. 469, 485, 74 N.E. 646. By choosing to create community schools as part of the state's program of education but independent of school districts, the General Assembly has not intruded on the powers of city school boards. Applying the facial-challenge standard, we hold that the appellants have not proved, beyond a reasonable doubt, that the powers of city school districts have been usurped, rendering R.C. Chapter 3314 unconstitutional. Section 3, Article VI of the Ohio Constitution does not prevent the General Assembly from creating additional schools that are located within city school districts but are not part of the district.

### 2. *Diversion of local tax money*

{¶ 48} Count four also alleges that R.C. Chapter 3314 violates Section 5, Article XII of the Ohio Constitution by diverting local tax dollars to community schools, a

contention similar to the constitutional claim asserted under the Thorough and Efficient Clause.

{¶ 49} Section 5, Article XII of the Ohio Constitution provides:

{¶ 50} "No tax shall be levied, except in pursuance of law; and every law imposing a tax, shall state, distinctly, the object of the same, to which only, it shall be applied."

{¶ 51} In support of this claim of diversion of local tax dollars, the appellants maintain that the community-school funding scheme violates voters' rights by taking the locally voted property taxes approved for the local school districts and giving them to community schools. While the appellants admit that "the money given to community schools comes from the State's bank account," they contend that deducting the full per-pupil formula amount from the school district's money when a student leaves for a community school is equivalent to taking local tax money.

{¶ 52} Community schools are funded differently than are traditional schools. Funding for traditional schools is set forth in R.C. 3317.012; funding for community schools is set forth in R.C. 3314.08. Community schools are primarily funded by a per capita subsidy taken from the state's basic aid to the school districts that the students in community schools are entitled to attend. R.C. 3314.08 clearly confirms that funding for community schools comes from state funds pursuant to the funding formula. Funds raised by local school districts, such as funds derived from local levies, are never sent from the local school district to the community schools, nor are any funds from the local school district to the state ever redirected to the community schools.

{¶ 53} Funding formulas for traditional and community schools are complex, although we may summarize them by saying that state money follows the student. In general, under both formulas, the state guarantees a basic minimum level of funding for each student, called the "formula amount." R.C. 3317.02. The General Assembly has determined the formula amount for both school districts and community schools, and these amounts have been codified in separate sections of the Revised Code. For community schools, the formula amount of R.C. 3314.03 can never exceed the traditional schools' amount of R.C. 3317.02(B). Community schools must set forth this amount in their annual financial plans under R.C. 3314.03(A)(15). Each district and each community school also has a cost-of-doing-business factor assigned to it, which varies from county to county. R.C. 3317.02(N) and 3314.08(A)(2) and (C)(1)(a).

{¶ 54} Under the school districts' formula, they are funded from a combination of state and local tax dollars. To reach the state and local amount for a school district, the state multiplies the formula amount by the cost-of-doing-business factor to reach a preliminary amount. R.C. 3317.022.

{¶ 55} The "charge-off amount," representing the local tax dollars raised, comes into play next in the formula. Local property-tax contributions are not determined on a per-student basis, but are instead determined by property wealth and the tax rate within a district. Each district is assumed to contribute 23 mills times the value of local tax base to its funding level, R.C. 3317.022, and as stated earlier, this local district share is a constant amount that does not fluctuate based upon student population. The charge-off amount is then subtracted from the preliminary amount. Once the charge-off amount is deducted, the remaining funding comes from the state in order to reach the formula amount specified in R.C. 3317.12 by the General Assembly.

{¶ 56} In using the formula for community schools,[9] the ODE multiplies the number of students enrolled in a community school times the base formula amount times the cost-of-doing-business factor. R.C. 3314.08(D). For each student, the state then deducts the formula amount, adjusted by the cost-of-doing-business factor, from the funding for the school district that the student would have attended. R.C. 3314.08(C). Consequently, when a student transfers to a community school from a school district, the district loses as much funding as it would if the student leaves for another school district, for a private school, or to be home schooled.

{¶ 57} The appellants argue that because the state deducts the entire formula amount for any student who leaves a traditional school for a community school, the deduction has the effect of increasing school districts' local share. However, a change in the number of students does not affect the amount of the school district's local share, because local tax dollars are contributed by the district's taxpayers and do not depend upon the number of students attending the school. R.C. 3314.08 and 3317.022. The full amount of the local tax money will continue to be available to the local school district. In other words, state funds follow the student; local funds do not.

{¶ 58} We are not persuaded by appellants' argument that local tax money is diverted to community schools under the funding formula. Certain traditional schools may rely more on local tax dollars, but students who leave the district leave with their own per-student allocation of state money, so this means that local tax dollars are never actually paid to community schools. Under the funding provisions of R.C. 3314.08(D), the tax dollars that fund community schools come entirely from the state.

---

9. R.C. 3314.08 offers many adjustments to the formula, including the possibility of proration in R.C. 3314.08(D), but for ease of discussion we have excluded the nuances and possible permutations to the formula.

{¶ 59} The appellants are concerned that students are leaving traditional schools for community schools and that traditional schools are bearing the burden of competition. Community-school opponents point to certain community schools that have experienced financial and operational issues as reason for rejection of the whole concept. Today's question, however, is not whether particular schools are operating within the law but whether R.C. Chapter 3314, as enacted, satisfies the Constitution. Any allegations about the manner in which certain community schools are run are properly addressed in the appellants' second cause of action, pending in the trial court. School funding continues to be an educational policy matter of immense concern and heated debate. Educational policy matters, however, are best left to the General Assembly, which is charged with enacting legislation that reflects the policy choices of the state's constituents.

{¶ 60} We are now considering only the constitutional challenges in this case, and from a constitutional perspective, we conclude that appellants have not proved a violation of the prohibition in Section 5, Article XII against the application of local taxes, because local tax dollars are not diverted to the state-funded community schools.

{¶ 61} The final claim at issue in this case deals with the financial relationship between the state and community schools under two constitutional provisions.

**E. Count Seven: Sections 4 and 5, Article VIII: Community schools and state credit and loans**

{¶ 62} Count seven of the third amended complaint alleges that R.C. 3314.08(J), which permits community schools to borrow money from the state, and R.C. 3318.50 and 3318.52, which provide loan guarantees to community schools, are unconstitutional.

*1. Extending state credit to community schools*

{¶ 63} Section 4, Article VIII of the Ohio Constitution provides:

{¶ 64} "The credit of the state shall not, in any manner, be given or loaned to, or in aid of, any individual association or corporation whatever; nor shall the state ever hereafter become a joint owner, or stockholder, in any company or association, in this state, or elsewhere, formed for any purpose whatever."

{¶ 65} The provisions of the statutes at issue here, R.C. 3314.08(J), 3318.50, and 3318.52, allow community schools to borrow money in anticipation of state funding, establish a classroom-facilities loan-guarantee program, and establish a community-school loan-guarantee fund. Citing Section 4, Article VIII, the appellants contend that guaranteeing loans and funding to community schools constitutes an unconstitutional lending of the state's credit to aid individual associations or corporations. In challenging the statute on its face, they must prove its constitutional defect beyond a reasonable doubt. *State ex rel. Dickman v.*

*Defenbacher*, 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, paragraph one of the syllabus.

{¶ 66} Section 4, Article VIII has generally been interpreted to prohibit lending the state's credit to private business enterprises, but not to organizations created for a public purpose, even if they are corporations. *State ex rel. Kauer v. Defenbacher* (1950), 153 Ohio St. 268, 282, 41 O.O. 278, 91 N.E.2d 512. In opposing the appellants' argument, the appellees argue that community schools are not private business enterprises, so statutory provisions for the state's guarantee of loans to community schools are constitutional. The plain language of R.C. 3314.03(A)(1) does not permit for-profit entities to become community schools. Community schools may be organized only as nonprofit corporations or as public-benefit corporations. R.C. 3314.03(A)(1).

{¶ 67} We have held that Section 4, Article VIII is satisfied where the state's credit is used by a public organization to advance a "public purpose." *State ex rel. Kauer v. Defenbacher*, 153 Ohio St. at 282, 41 O.O. 278, 91 N.E.2d 512 ("whether it is a corporation or not, the turnpike commission is * * * a public organization created for a public purpose," and so advancement of state funds to the commission is constitutional). See *State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59 (state grants to veterans' organizations are constitutional); *State ex rel. Leaverton v. Kerns* (1922), 104 Ohio St. 550, 554, 136 N.E. 217 (county grant to a county agricultural fair is constitutional because it is "a public institution designed for public instruction"); *Perkins v. Stockert* (1975), 45 Ohio App.2d 211, 74 O.O.2d 334, 343 N.E.2d 340 (funding of legislatively created "new community authorities" to assist private entities in community development is constitutional because each authority is created for a public purpose). In *State ex rel. Dickman v. Defenbacher*, we held that under Section 4, Article VIII, the legislature could validly appropriate public funds to a private entity for a public purpose. 164 Ohio St. at 151, 57 O.O. 134, 128 N.E.2d 59.

{¶ 68} Community schools were developed to further the state's public school system of education. We cannot imagine a greater public purpose than educating our state's children. Applying the facial-challenge standard to R.C. 3314.08(J), 3318.50, and 3318.52, we hold that the appellants have not established that the statutes are unconstitutional beyond a reasonable doubt.

### 2. *Funding community schools through loan guarantees*

{¶ 69} Under this claim, the appellants assert that the loan guarantees for community schools allowed by R.C. 3318.50 and 3318.52 violate the provisions of the Constitution that prohibit the state's assumption of the debt of any corporation unless certain exceptions apply. Section 5, Article VIII of the Ohio Constitution provides:

{¶ 70} "The state shall never assume the debts of any county, city, town, or township, or of any corporation whatever, unless such debt shall have been created to repel invasion, suppress insurrection, or defend the state in war."

{¶ 71} Turning to the plain language of the Constitution, the appellants highlight the statement "The state shall never assume the debts * * * of any corporation whatever." Because community schools must be formed as nonprofit or public-benefit *corporations,* R.C. 3314.03(A)(1), they argue that the statute offends this constitutional provision.

{¶ 72} Ohio's school districts are not included within this provision's prohibition, for Section 5, Article VIII does not forbid the state's assumption of the debt of political subdivisions that are not of the types named. *Butler Cty. Transp. Improvement Dist. v. Tracy* (1997), 120 Ohio App.3d 346, 359, 697 N.E.2d 1089 (Section 5, Article VIII does not apply to many types of political subdivisions in Ohio, such as school districts, regional water and sewer authorities, solid waste authorities, or transportation-improvement districts). The appellees argue that community schools are regarded as school districts because they are required to comply with certain Ohio laws as if they were school districts. See, e.g., R.C. 3314.03(A)(11)(d) and 3314.08(F). Earlier in this opinion, we concluded that community schools belong to the state's system of common schools. By statute, they are "part of the state's program of education." R.C. 3314.01(B). Like traditional schools, community schools are funded by the state, cannot charge tuition, and are charged with educating Ohio children. As a result, they are not private business corporations the debt of which the state is prohibited from assuming under Section 5. Therefore, community schools are also exempt from this provision. Accordingly, we do not find a constitutional violation beyond a reasonable doubt under Section 5, Article VIII of the Ohio Constitution.

## IV. Conclusion

{¶ 73} We hold that the appellants in this case have not shown constitutional defects in R.C. Chapter 3314, on its face or as applied. When the General Assembly enacted Ohio's Community–Schools Act, it was entrusted with making complicated decisions about our state's educational policy. These policy decisions are within the purview of its legislative responsibilities, and that legislation is entitled to deference. *Brady v. Safety–Kleen Corp.* (1991), 61 Ohio St.3d 624, 632, 576 N.E.2d 722 (a court has nothing to do with the policy or wisdom of a statute. That is the exclusive concern of the legislature). The General Assembly always has the prerogative to determine that Ohio's community schools are not meeting the purpose for which they were established and, consequently, has the ongoing opportunity to modify or dismantle them. After full consideration, we cannot say that the concept of community schools itself violates the Ohio Constitution.

{¶ 74} We therefore affirm the decision of the Court of Appeals for Franklin County to dismiss part of count four, as community schools do not violate Section 3, Article VI of the Ohio Constitution. We reverse the court of appeals' decision to remand the remaining constitutional claims under Section 5, Article XII; Section 2, Article VI; Section 4, Article VIII; and Section 5, Article VIII for further proceedings. As there were no disputed issues of fact, we hold as a matter of law that R.C. Chapter 3314, relating to the establishment of community schools as part of the state's educational system, is constitutional both on its face and as applied.

Judgment affirmed in part
and reversed in part.

MOYER, C.J., LUNDBERG STRATTON and O'CONNOR, JJ., concur.

RESNICK and PFEIFER, JJ., dissent.

O'DONNELL, J., dissents and would dismiss the appeal as having been improvidently accepted.

---

ALICE ROBIE RESNICK, J., dissenting.

{¶ 75} In my opinion, R.C. Chapter 3314, the Ohio Community-Schools Act, violates Section 2, Article VI of the Ohio Constitution because it produces a hodgepodge of uncommon schools financed by the state. Rather than "add[ing] to the traditional school system," ¶ 30, or "providing for community schools within that system" of common schools, as the majority postulates, ¶ 34, R.C. Chapter 3314 effects a schismatic educational program under which an assemblage of divergent and deregulated privately owned and managed community schools competes against public schools for public funds.

{¶ 76} Section 2, Article VI provides:

{¶ 77} "The general assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the state * * *."

{¶ 78} Since this provision does not prescribe a specific method for securing a system of common schools, it necessarily grants the General Assembly broad discretion in fulfilling its obligation. Accordingly, I agree with the majority that "the General Assembly has the authority to set the standards and requirements for a system of common schools." ¶ 34.

{¶ 79} But the General Assembly's discretion under Section 2, Article VI is not unlimited. "To state that the General Assembly must be granted wide discretion and that it is not the function of this court to question the wisdom of the statutes, is not to say that the General Assembly's discretion in this area is absolute."

*Cincinnati City School Dist. Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 386, 12 O.O.3d 327, 390 N.E.2d 813.

{¶ 80} Specifically, the General Assembly does not have the authority under Section 2, Article VI to establish something other than a system of common schools. It is empowered to do only what it is charged with doing, which is to secure a thorough and efficient system of common schools throughout the state. Thus, as the court explained in *Simmons–Harris v. Goff* (1999), 86 Ohio St.3d 1, 11, 711 N.E.2d 203, "It can be argued that implicit within this obligation is a prohibition against the establishment of a system of uncommon (or nonpublic) schools financed by the state."

{¶ 81} Nor does Section 2, Article VI displace the power of judicial review. While the General Assembly has the exclusive authority and duty to establish a system of common schools, it is for the courts to determine the constitutional criteria against which the exercise of that power is to be measured. We may act with deference to legislative pronouncements,[1] but we are still obliged to make an independent determination of what constitutes a system of common schools. Defining the parameters of legislative power under Section 2, Article VI, and ensuring conformity thereto, remains a judicial function. See *Walter*, 58 Ohio St.2d at 382–387, 12 O.O.3d 327, 390 N.E.2d 813.

{¶ 82} While the majority describes some of the history leading to the adoption of the Thorough and Efficient Clause, it nevertheless treats the mandate for a system of common schools as standardless, denoting any schooling arrangement that the General Assembly decides to support by general taxation. Yet the formative history of Section 2 discloses that the common-schools requirement does impose an articulable and meaningful standard upon the legislature and that R.C. Chapter 3314 recreates much of the mischief that the clause was intended to avoid.

{¶ 83} As generally explained by Molly O'Brien and Amanda Woodrum, The Constitutional Common School (2004), 51 Clev.St.L.Rev. 581:

{¶ 84} "Recent school reform initiatives have adopted the mechanisms of vouchers and charters to provide public funding for parental choice of schools. * * * Virtually all of these programs, however, envision a proliferating variety of available schools, competition among schools for tax support, and attendance by parental selection, rather than by public assignment. Even though charter and voucher schools are prohibited from discriminating in admissions on the basis of religion, by statute and by the federal Constitution, they permit like-minded

---

1. The General Assembly declares in R.C. 3314.01(B), "A community school created under this chapter is a public school, independent of any school district, and is part of the state's program of education."

people to flock together. They permit parental choice of a school based on the parents' unique set of values and priorities, biases and prejudices.

{¶ 85} " * * *

{¶ 86} "The constitutional 'common school' has specific meaning that must be referenced in the evaluation of school reform programs. Central to that meaning is the requirement that the publicly-supported school system educate children of all classes, religions, and ethnic backgrounds together. * * * For the framers of the Ohio Constitution's education clauses, the only education worthy of public support was a 'common' education, not in the sense that it was provided for the common folks, but in the sense that it would bring diverse people together. They chose the common school concept to promote social harmony, create a sense of national identity, and develop affinity. * * *

{¶ 87} "Moreover, in choosing to mandate the creation of a system of common schools, the constitutional framers rejected the idea of simply subsidizing the existing diverse, parent-initiated and tuition-based schooling arrangements in favor of creating state organization and oversight. They viewed the diversity of the existing arrangements as an impediment to educational progress. The constitutional framers rejected the proliferation of diverse schools in favor of a single system. They also rejected the idea of competition among school districts and a variety of sectarian schools, viewing competition as inefficient, divisive, and ineffective. The rivalry among schools was seen as the greatest impediment to the advancement of education. Indeed, the problems created by the continuing disparities and competition among local districts generated further constitutional amendments in 1912. These amendments [i.e., Sections 3 and 4, Article VI] centralized state oversight of the system of public schools by creating a state superintendent; they further provided for public oversight of the districts through election. Thus, programs that create competition among schools for public funds or remove schools from state and public oversight also run counter to the constitutional vision and mandate." (Emphasis sic; footnotes omitted.) Id. at 638–641.

{¶ 88} Community schools under R.C. Chapter 3314 are nonprofit or public-benefit corporations that operate independently of any school district. R.C. 3314.01(B) and 3314.03(A)(1). They are governed by the terms of their individual contracts, have their own governing authorities, and are directly accountable to their sponsors. R.C. 3314.02(D) and (E), 3314.03(D), 3314.04, and 3314.07. Any qualified tax-exempt entity under Section 501(c)(3) of the Internal Revenue Code that has been in operation for five years, has assets of $500,000, and is considered by the Department of Education to be an education-oriented entity may sponsor up to 50 community schools (potentially more for some sponsors) and receive from each an "oversight and monitoring" fee of up to three percent of the

payments for operating expenses that the school receives from the state. See R.C. 3314.015(B)(1), 3314.02(C)(1)(f), and 3314.03(C).

{¶ 89} Community schools were originally introduced in Ohio on a limited basis through a pilot project in the Lucas County area. 1997 Am.Sub.H.B. No. 215, Section 50.52, Subsection 2(B), 147 Ohio Laws, Part I, 2043. They have since grown at a steady rate. According to a preliminary report on community schools in Ohio that was issued on April 11, 2002, by the Legislative Office of Education Oversight (established by R.C. 3301.68), "Since 1998, the number of community schools in Ohio has increased annually, from the first 15 that began operating during the 1998–1999 school year to 92 schools during the 2001–2002 school year. The number of participating students has grown tenfold from 2,245 to over 23,000 during these years." Based on the listings in the March 2005 School Directory issued by the Office of Community Schools (see R.C. 3311.11) and information contained in a research bulletin published by the Ohio Education Association ("OEA") in March 2005, there were over 62,000 students enrolled in approximately 250 community schools throughout Ohio during the 2004–2005 school year.

{¶ 90} Community schools receive state funds that are deducted from payments to the school districts in which the enrolled students are entitled to attend school. R.C. 3314.08. In an affidavit filed on behalf of appellants in the trial court, William P. Driscoll, a former Ohio Deputy Tax Commissioner from 1985 to 1991, calculated that community-school deductions in fiscal year 2002 amounted to more than $133 million. According to Ohio Department of Education records, state funding for community schools for fiscal year 2005 totals over $400 million. In its March 2005 research bulletin, OEA calculated that "[b]y the end of the current [2004–2005] school year, Ohio's charter schools will have received over $1.2 billion * * * in funding since the inception of the state's charter school program."

{¶ 91} Yet community schools are exempt from the bulk of state standards and regulations that govern the operation of public schools. In fact, the stated purpose of R.C. Chapter 3314 is to establish "independent community schools throughout the state * * * in a deregulated setting." 1997 Am.Sub.H.B. No. 215, Section 50.52, Subsection 2(B), 147 Ohio Laws, Part I, 2043. Accordingly, R.C. 3314.04 provides:

{¶ 92} "Except as otherwise specified in this chapter and in the contract between a community school and a sponsor, such school is exempt from all state laws and rules pertaining to schools, school districts, and boards of education, except those laws and rules that grant certain rights to parents."

{¶ 93} On October 23, 2003, the Legislative Service Commission issued a research memorandum, No. R–125–1824, on the "Laws from Which Community Schools Are Exempt and Specifically Not Exempt." The memo enumerates over

150 state measures from which community schools are exempt, which run the gamut of education laws from curriculum and enrollment requirements to discipline policies and building standards. These are not random exclusions from insubstantial provisions. The exemptions are pervasive, extensive, and diffused throughout the entirety of Title 33 of the Revised Code. See Appendix B.

{¶ 94} Largely unregulated and privately operated, community schools are free to adopt their own specific instructional approaches, educational goals, and philosophical agendas. Indeed, they are exempt from the provisions of R.C. 3313.602(B) and (C), which require public schools to ensure that "the principles of democracy and ethics are emphasized and discussed wherever appropriate in all parts of the curriculum" and to encourage all employees to be aware of their roles "in instilling ethical principles and democratic ideals in all district pupils."

{¶ 95} Section 2, Article VI was intended to bring order to the chaos of individualized approaches that resulted from the nascent mélange of loosely regulated and diverse schooling arrangements by mandating the creation and funding of a uniform and coherent body of governmentally controlled schools. R.C. Chapter 3314 contravenes that intent by reversing the process. It creates a jumble of ad hoc community schools that flourish on state funds otherwise inuring to the account of district schools.

{¶ 96} Although I disagree with the majority's view of Section 2, Article VI on a fundamental level, our differences are primarily grounded in constitutional analysis. However, I find the following passage in the majority's opinion to be questionable:

{¶ 97} "Throughout time, new educational movements have faced opponents and detractors. But just as the common-school movement of the 1800s increasingly gained supporters throughout the United States, so too has the charter-school movement." ¶ 27.

{¶ 98} This court's function is to determine the constitutionality of charter schools as established by statute in Ohio, not to promote their cause. Whether the "charter-school movement" has truly gained supporters or opponents, nationally or in Ohio, is a subject of social discourse for the political branches of our government. I also point out that the common-school movement of the 1800s resulted in a constitutional amendment, i.e., Section 2, Article VI and eventually also Sections 3 and 4, Article VI. That is not the case with charter schools.

{¶ 99} I respectfully dissent.

.

---

PFEIFER, J., dissenting.

{¶ 100} Although I agree with the main premise of the majority opinion, that the Ohio Constitution does not prohibit the establishment of charter schools, I write separately because I conclude that charter schools as currently established are unconstitutional.

{¶ 101} To many, the establishment of an alternative to public schools is a noble experiment, designed to enable students to escape failing public schools. Sadly, in many instances, the cure is worse than the disease. An August 16, 2006 article in the Columbus Dispatch indicates that 50 percent of the charter schools in Franklin County received the lowest possible rating: emergency. Presumably, most of the students attending charter schools in Franklin County left the Columbus School District, the largest school district in Franklin County and the school district that met the lowest percentage of state standards: 20 percent. In aggregate, the charter schools in Franklin County met even fewer state standards: 18.5 percent. In Franklin County, only three charter schools that met more than one state standard met 50 percent of the standards that were calculated: Graham School met nine of 12 standards, Great Western met five of six, and Upper Arlington I.B. met six of six. The other 33 charter schools in Franklin County met only 12.4 percent of state standards.

{¶ 102} Whether charter schools are the answer to failing public schools has not been settled, though the early results are not especially encouraging. Still, the Ohio Constitution does not prohibit the establishment of charter schools. What the Ohio Constitution does prohibit is an excessive reliance on locally raised funds to finance public schools. *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733; *DeRolph v. State* (2000), 89 Ohio St.3d 1, 728 N.E.2d 993; and *DeRolph v. State,* 97 Ohio St.3d 434, 2002-Ohio-6750, 780 N.E.2d 529. Irrespective of the noble intentions of charter-school legislation, one undeniable effect is that public schools receive less state money than they would in the absence of charter schools. The mathematically unavoidable result is that public schools receive a greater percentage of their funding from local sources, which is unconstitutional pursuant to our *DeRolph* decisions.

{¶ 103} Finally, if charter schools are to be part of a thorough and efficient system of common schools—as they must—then they should be held to the same standards as public schools. Though the General Assembly has taken steps in that direction, it is clear, as the majority opinion concedes and as Justice Resnick's dissenting opinion explains in detail, that charter schools are currently exempt from many standards that public schools are required to meet.

{¶ 104} I respectfully dissent.

**O'Donnell, J., dissenting.**

{¶ 105} In my view, this court has prematurely accepted review over a very limited but important constitutional issue regarding the establishment and operation of community schools statewide, and the majority has considered it on a scant record. Even a cursory reading of the majority and dissenting opinions reveals the complexity of the issue and the divergent positions taken by the members of the judiciary who have reviewed it at all levels. Regrettably, appellants have not fully developed this record, as the trial court originally bifurcated the case into the legal issues, which are allegedly before us, and the remaining factual issues, which are still before the trial judge.

{¶ 106} The better course would have been to deny review and later accept the case in its entirety. The majority opinion states, "The appellants have not presented clear and convincing evidence that community schools are raiding local funds that school districts are otherwise entitled to receive." ¶ 39. Justice Resnick's opinion assumes the point, stating that R.C. Chapter 3314 "creates a jumble of ad hoc community schools that flourish on state funds otherwise inuring to the account of district schools." ¶ 95.

{¶ 107} I cannot understand how a constitutional review of a legal issue may be resolved on a yet-to-be-developed record of whether local or state tax money is or is not being diverted to community schools under the funding formula. This appears to me to be a factual question capable of being resolved by presentation of evidence, and the court of appeals, at least in part, so held.

{¶ 108} I did not vote to accept this case, because I believed the record needed development, despite the entreaties from both parties to resolve the constitutional issue. I still believe that to be the correct course for this court to follow, i.e., to dismiss this appeal as having been improvidently accepted, to await further record development, and to approach the entire case on a complete record.

{¶ 109} I would therefore dismiss this appeal as having been improvidently accepted.


APPENDIX A

{¶ 110} According to the Legislative Service Commission memorandum No. R–125–1824, community schools are *not* exempt from the requirements of the following Revised Code sections:

{¶ 111} "9.90 and 9.91 Provision regarding insurance benefits for educational employees.

{¶ 112} "Chapter 102 Ohio Ethics Law (except that a member of a community school governing board specifically may also be an employee of the board and may have an interest in a board-executed contract that is not a contract with a for-profit firm for the operation of management of a school under the auspices of the governing board (R.C. 3314.03(A)(11)(e)).

{¶ 113} "109.65, 3313.672, and 3313.96 Requirements for missing children reporting, information, and student fingerprinting.

{¶ 114} "Chapter 117.  State fiscal auditing requirements.

{¶ 115} "121.22 The Public Meetings ('Sunshine') law.

{¶ 116} "149.43 The Public Records Law.

{¶ 117} "Chapter 1347.  Ohio Privacy Law.

{¶ 118} "2151.358 Procedures pertaining to school records of adjudicated delinquents after their court records are expunged.

{¶ 119} "2151.421 Child abuse reporting requirements.

{¶ 120} "2313.18 Employment protection for employees on jury duty.

{¶ 121} "Chapter 2744.  The Sovereign Immunity Law for public employees.

{¶ 122} "3301.0710 and 3301.0711 Statewide achievement testing.

{¶ 123} "3301.0712 Phase-in of achievement tests.

{¶ 124} "3301.0714 Education Management Information System (EMIS) requirements (as prescribed by Department of Education rules adopted under R.C. 3314.17).

{¶ 125} "3301.0715 Administration and scoring of statewide diagnostic assessments and provision of intervention services.

{¶ 126} "3302.04 Requirement to develop a continuous improvement plan for certain schools that fail to meet annual yearly progress and to take other actions (such as installing a new curriculum and reconstituting schools) for schools that persistently do not demonstrate improvement, to the extent and manner prescribed in R.C. 3314.03(A)(24).

{¶ 127} "Chapter 3307.  State Teachers Retirement System.

{¶ 128} "Chapter 3309.  School Employees Retirement System.

{¶ 129} "3313.205 Requirement to adopt a policy on notification of a parent when the parent's child is absent from school.

{¶ 130} "3313.375 Authorization and procedures for entering into lease-purchase contracts for the acquisition of facilities (in the same manner as school districts and educational service centers).

{¶ 131} "3313.450 Requirement to adopt a policy on parent involvement in schools.

{¶ 132} "3313.50 Record requirements relating to student hearing and vision testing.

{¶ 133} "3313.602(D) Requirement that each school devote one hour to observance of Veteran's [sic] Day.

{¶ 134} "3313.608 'Third grade reading guarantee.'

{¶ 135} "3313.6012 Requirement to have policy on academic 'prevention/intervention' services.

{¶ 136} "3313.61, 3313.611, 3313.614, and 3313.615 Requirement to award diploma to students meeting the testing criteria and completing the high school curriculum. (Community schools are not subject to the Revised Code's curriculum requirements. They set their own curricula.)

{¶ 137} "3313.643 Requirement that students and teachers wear industrial eye protection in certain industrial courses or activities.

{¶ 138} "3313.648 Prohibition on offering monetary payment of other in-kind gift to a student or a student's parent or guardian as an incentive for that student to enroll in a school.

{¶ 139} "3313.66, 3313.661, and 3313.662 Student suspension, expulsion, and permanent exclusion requirements.

{¶ 140} "3313.67 Requirement to keep records of student immunizations.

{¶ 141} "3313.671 Prohibition against allowing a student to remain in school longer than 14 days without submitting immunization records or evidence that immunization is in progress (except that the parental right to excuse a child from immunization for religious reasons applies).

{¶ 142} "3313.672 Requirement to request records from a child's previous school.

{¶ 143} "3313.673 Screening of new kindergartners and first-graders in hearing, vision, speech and communication, and health.

{¶ 144} "3313.69 Requirement to include hearing and vision screening if school opts to have any dental and medical screening.

{¶ 145} "3313.71 Tuberculin testing requirements.

{¶ 146} "3313.712 Requirement to provide the parent of every enrolled student a statutorily prescribed blank emergency medical authorization form.

{¶ 147} "3313.716 Requirement that public schools permit students to self-administer asthma medication.

{¶ 148} "3313.80 Requirement to display the national flag.

{¶ 149} "3314.011 Community school fiscal officer education requirements.

{¶ 150} "3314.03(A)(6)(b) Requirement that a community school automatically withdraw from enrollment any student who has failed without legitimate excuse to participate in 105 consecutive hours of offered learning opportunities.

{¶ 151} "3314.031 Requirement that 'Internet and other computer-based community schools' use a filtering device or software to block access to materials that are obscene or harmful to juveniles on all computers provided to students for instructional use.

{¶ 152} "3314.032 Requirement that an 'Internet and other computer-based community schools' provide one computer to each student enrolled in the school unless a parent with more than one child from the parent's household enrolled in the school waives that right.

{¶ 153} "3314.041 Requirement that each community school distribute to parents of students at the time the students enroll in school a written statutorily-prescribed statement explaining that the school is a public school and that students are subject to achievement testing and other statutory requirements.

{¶ 154} "3319.073 Requirement for teacher in-service training in child abuse prevention.

{¶ 155} "3319.22 to 3319.30 and 3319.301 Teacher licensing requirements.

{¶ 156} "3319.321 Requirements for confidentiality of student information.

{¶ 157} "3319.39 Requirements for criminal records checks of job applicants.

{¶ 158} "3321.01 Requirements relating to admittance of children to kindergarten and first grade.

{¶ 159} "3321.13 Reporting requirements related to a child withdrawing from school; requirement to report certain withdrawn students to the Registrar of Motor Vehicles.

{¶ 160} "3321.14, 3321.17, 3321.18, 3321.19, and 3321.191 Compulsory School Law enforcement requirements.

{¶ 161} "Chapter 3323. Requirements related to special education.

{¶ 162} "3327.10 School bus driver qualifications.

{¶ 163} "Chapter 3365. Requirement to participate in Post–Secondary Enrollment Options Program.

{¶ 164} "3365.041 Requirement that governing authority of a community school that expels a student notify the pertinent higher education institution that the student attends under the Post–Secondary Enrollment Options Program.

{¶ 165} "Chapter 3742. Requirements to take actions to prevent lead poisoning and to control lead hazard in schools.

{¶ 166} "4111.17 Ohio Equal Pay Law (anti-discrimination related to wages).

{¶ 167} "Chapter 4112.  Ohio Civil Rights Act.

{¶ 168} "4113.52 Ohio Whistleblower Law.

{¶ 169} "Chapter 4117.  The state Collective Bargaining Law (as prescribed in R.C. 3314.10(A)(2) and (3)).

{¶ 170} "Chapter 4123.  Workers' Compensation Law.

{¶ 171} "Chapter 4141.  Unemployment Compensation Law.

{¶ 172} "Chapter 4167 State Occupational Safety and Health Law.

{¶ 173} "5705.391 Requirements for five-year projections of school district revenues and expenditures.

{¶ 174} "In addition, community schools must comply with any laws or rules that 'grant certain rights to parents' [R.C. 3314.04] and with health and safety standards established by law for school buildings [R.C. 3314.05]." (Footnotes omitted.)

{¶ 175} "It should be noted that community schools are subject to any and all federal laws which apply to schools and employers generally—for example, FERPA [the Family Educational Rights and Privacy Act, Section 1232g, Title 20, U.S.Code] and the various federal anti-discrimination laws.  Moreover, as public schools, community schools are subject to all the constitutional constraints that apply to governmental bodies—for example, the obligation to recognize freedom of speech and association, and to provide due process and equal protection of the laws.  It is also important to recognize that community schools are subject to the federal law relating to the education of children with disabilities (IDEA) [Sections 1401 et seq., Title 20, U.S.Code] and to have the primary responsibility for providing a free appropriate public education (FAPE) [Sections 1401(8) and 1412(a)(1), Title 20, U.S.Code] for such children under the provisions of that law." (Footnotes omitted.)  Carey, Anderson's Ohio School Law Guide (2006) 48, Section 2.27.

## APPENDIX B

{¶ 176} According to Legislative Service Commission memorandum No. R–125–1824, community schools are exempt from the following requirements:

{¶ 177} "124.01 et seq.  Civil Service Law (related to nonteaching employees in city school districts.)

{¶ 178} "133.01 et seq.  Uniform Public Securities Law (However, other than borrowing for facilities acquisition under loans guaranteed by the state, community schools may not issue notes with a duration longer than one fiscal year.)

{¶ 179} "Chapter 135.  Uniform Depository Act.

{¶ 180} "149.351 and 149.41 Requirements on retention of school records and establishing a records commission.

{¶ 181} "3301.07 State Board of Education minimum standards covering the assignment of professional personnel according to training and qualifications; instructional materials and equipment, including library facilities; proper organization, administration, and supervision of schools; buildings and grounds (other than any building health and safety standards); admission and promotion of students; driver education courses; phonics instruction; instruction in energy and resource conservation; and reporting requirements.

{¶ 182} "3301.072 Training requirements for school treasurers and business managers.

{¶ 183} "3301.073 Required receipt of State Board technical assistance in school budgeting and finances.

{¶ 184} "3301.078 25-pupil class size limit for bilingual multicultural classes.

{¶ 185} "3301.0719 Required receipt of services under any educational service center plan of service.

{¶ 186} "3301.16 School chartering requirements.

{¶ 187} "3301.17 Driver education course standards.

{¶ 188} "3301.52 to 3301.59 Preschool program standards and licensing (other than parental access rights).

{¶ 189} "Chapter 3302. Performance indicators for school districts, except that community schools 'to the extent possible' must comply with R.C. 3302.04, which requires continuous improvement plans and other actions and sanctions for schools that fail to meet annual yearly progress, in the manner prescribed in R.C. 3314.03(A)(24).

{¶ 190} "Chapter 3311. Requirements related to the formation and territory of school districts and educational service center financing districts.

{¶ 191} "3311.29 Requirement to maintain grades kindergarten through twelve.

{¶ 192} "3313.01 to 3313.17 and 3313.18 Requirements related to the membership, organization, and operation of school boards.

{¶ 193} "3313.174 Requirement to appoint a business advisory council.

{¶ 194} "3313.20 Requirement to make rules necessary for the governing of employees, students, and other persons entering a school; to post the school entry rules; and to have a written policy on employees' attendance at professional meetings.

{¶ 195} "3313.201 Requirement to purchase liability insurance (though the community schools law has its own provision requiring a community school to purchase liability insurance (3314.03(11)(b)).)

{¶ 196} "3313.202 Requirements related to the provision of life, health, accident, and legal insurance benefits for school district employees.

{¶ 197} "3313.208 and 3313.209 Latchkey program operating requirements.

{¶ 198} "3313.211 Requirement to pay full-time employees while on jury duty.

{¶ 199} "3313.22 to 3313.32 Requirements related to the appointment, conduct, and duties of school district treasurers.

{¶ 200} "3313.35 Requirements concerning who is legal counsel for school boards.

{¶ 201} "3313.372 Requirements related to installment payment contracts for energy conservation measures for school facilities.

{¶ 202} "3313.373 Requirements related to shared-savings contracts for energy savings measures for school facilities.

{¶ 203} "3313.41 Disposal of real and personal property requirements.

{¶ 204} "3313.44 Real and personal property tax exemption for school districts.

{¶ 205} "3313.46 (and related sections in Chapter 153)  Competitive Bidding Law regarding school building projects.

{¶ 206} "3313.47 Vesting of management and control of schools in the board of education.

{¶ 207} "3313.471 Prohibition of nonuniform restrictions on the presentation of career information to students.

{¶ 208} "3313.48 Standards for minimum school year and minimum school day (although community schools are required to provide 920 hours of instruction annually (R.C. 3314.03(A)(11)(a))); requirement that education be provided free of charge (though a community school is prohibited from charging tuition (R.C. 3314.08(I))).

{¶ 209} "3312.481 Requirements related to alternative calendars for schools.

{¶ 210} "3313.482 Contingency plan requirement for making up calamity days.

{¶ 211} "3313.483, 3313.487 to 3313.4810 Prohibition against closing schools for financial reasons;  requirements and procedures related to school financial crises and resulting loans.

{¶ 212} "3313.49 Student assignment requirements when a school is suspended.

{¶ 213} "3313.51 Check writing and deposit requirements related to school treasurers.

{¶ 214} "3313.53 Requirements related to employing certificated persons for pupil-activity programs.

{¶ 215} "3313.531 and 3313.532 Adult high school continuation program requirements.

{¶ 216} "3313.534 Requirement for 'zero-tolerance' discipline policies;  requirement that Big 8 and certain other school districts establish alternative schools.

{¶ 217} "3313.536 Requirement to adopt comprehensive school safety plan.

{¶ 218} "3313.55 Requirements related to schooling for persons with epilepsy.

{¶ 219} "3313.56 Part-time schooling requirements for programs provided to students with age and schooling certificates.

{¶ 220} "3313.60 School course of study requirement (except that the parental rights to excuse a child from certain instructional topics and to examine instructional materials and other documents apply.)

{¶ 221} "3313.601 Prohibition against barring teachers from providing periods for programs or meditation on moral, philosophical, or patriotic themes (except that the parental right to excuse a child from these programs applies.)

{¶ 222} "3313.602(A) Requirement to have a policy regarding the recitation of the pledge of allegiance to the flag.

{¶ 223} "3313.602(B) and (C) Requirement that the 'principles of democracy and ethics' are emphasized and discussed in appropriate parts of the curriculum and to encourage a school's employees to be cognizant of their roles to instill in students 'democratic and ethical ideals'.

{¶ 224} "3313.603 High school curriculum requirements.

{¶ 225} "3313.604 Recognition of American Sign Language as a foreign language in schools.

{¶ 226} "3313.605 Implementation requirements for school districts electing to offer community service. education programs under federal law.

{¶ 227} "3313.609 Requirements to retain certain chronic truants.

{¶ 228} "3313.6011 Requirement that venereal disease education, which is a component of health education, emphasize sexual abstinence.

{¶ 229} "3313.613 Requirement to award high school credit to a student for successful completion of a post-secondary course outside of regular school hours.

{¶ 230} "3313.62 Definitions of 'school year,' 'school month,' and 'school week'.

{¶ 231} "3313.63 Specification of school holidays.

{¶ 232} "3313.64 and 3313.65 School admission requirements related to the payment of tuition; tuition payment and charging requirements between school districts.

{¶ 233} "3313.642 Requirement for certain districts to furnish needy students with materials used in a course of instruction other than the necessary textbooks or electronic textbooks.

{¶ 234} "3313.646 Requirements and prohibitions related to establishment of preschool programs.

{¶ 235} "3313.70 Prohibition against appointment of a school board member as school physician, dentist, or nurse.

{¶ 236} "3313.713 Requirements related to administering prescription drugs to students (except that the parental right to have a school administer prescription drugs to a child only after requesting it in writing applies.)

{¶ 237} "3313.714 Requirement, upon request from the Department of Job and Family Services, to operate a 'healthcheck' program for students covered by Medicaid (except that the parental right to excuse a child from a healthcheck examination applies.)

{¶ 238} "3313.75 Prohibition against renting or leasing a school building so as to interfere with the public schools of the district or for any purpose other than authorized by law.

{¶ 239} "3313.751 Prohibition against students smoking in any area controlled by a school board; requirement that a school board have a disciplinary policy to enforce the smoking prohibition.

{¶ 240} "3313.752 Requirement that a warning about anabolic steroids be posted in school locker rooms.

{¶ 241} "3313.76 to 3313.79 Requirements related to the use of school buildings by the public when not being used for school purposes.

{¶ 242} "3313.81 Requirements related to food service operations and meals for the elderly.

{¶ 243} "3313.811 Prohibition against the sale of anything for profit on school premises unless all profits are used for a school purpose or for a school activity.

{¶ 244} "3313.813 State Board of Education standards for school food programs (except that any health or safety standards related to school facilities apply.)

{¶ 245} "3313.814 Requirement for school boards to have a policy governing the types of food sold on school premises.

{¶ 246} "3313.815 Requirement to have an employee trained in the Heimlich Maneuver during periods food is being served to students.

{¶ 247} "3313.841 and 3313.842 Requirements related to sharing certain services cooperatively with other districts and operating joint education programs.

{¶ 248} "3313.843 Requirements related to receiving services provided by educational service centers.

{¶ 249} "3313.85 Requirement that the probate court, or in some cases the educational service center, perform functions that a school board fails to perform.

{¶ 250} "3313.871 Fee limits for school district participation in accrediting associations.

{¶ 251} "3313.90, 3313.91, and 3313.911 Vocational education requirement.

{¶ 252} "3313.92 Requirements related to joint construction projects between school districts.

{¶ 253} "3313.93 Prohibition against students being paid for work in a school district occupational work adjustment laboratory from being considered employees for purposes of school employee retirement law, nonteaching employee contract law, unemployment compensation law, and workers' compensation law (apparently meaning that students in such a program operated by a community school are considered employees and, therefore, presumably are subject to whatever law is applicable to other community school employees.)

{¶ 254} "3313.941 Requirement to include a 'multiracial' category in any statistics on race gathered for state or school district purposes.

{¶ 255} "3313.95 Contract requirements for police services in alcohol and drug prevention programs.

{¶ 256} "3313.97 Intradistrict open enrollment requirements (except the requirement that parents receive information about the program—presumably in the district in which the community school is located—applies.)

{¶ 257} "3313.98, 3313.981, 3313.982, and 3313.983 Interdistrict open enrollment requirements (except the requirement that parents receive information about the program applies.)

{¶ 258} "3315.02 to 3315.05 Requirements related to the administration of funds for bond indebtedness (other than bonds secured by tax revenues, which community schools are prohibited from issuing (R.C. 3314.08(H))).

{¶ 259} "3315.062 Requirements related to the provision and funding of student activity programs.

{¶ 260} "3315.07 Requirements related to the publishing of school materials for the public; prohibition against using public funds to support or oppose the passage of a school levy or bond issue or to compensate any district employee for time spent on supporting or opposing a levy or bond issue.

{¶ 261} "3315.08 Requirements related to the payment of employee salaries and the administration of a payroll account.

{¶ 262} "3315.09 Limitation of only a one-year contract with a college or museum for the provision of instructional programs to students.

{¶ 263} "3315.091 Requirements and limitations related to contracting with a driver training school for the provision of driver education.

{¶ 264} "3315.10 Requirements related to the management and control of certain property held in trust for educational purposes.

{¶ 265} "3315.11 to 3315.14 Requirements related to establishing and administering a school building replacement fund.

{¶ 266} "3315.15 Requirements related to school board service funds for paying school board members' expenses in the performance of their duties.

{¶ 267} "3315.17 and 3315.171 Requirement to maintain a Textbook and Instructional Materials Fund.

{¶ 268} "3315.18 and 3315.181 Requirement to maintain a Capital and Maintenance Fund.

{¶ 269} "3315.19 Requirements regarding election of set-aside amounts.

{¶ 270} "3315.29 to 3315.31 (and related 501.01 to 501.14) Requirements related to common school funds.

{¶ 271} "3315.37 Requirements related to school district teacher education loan programs.

{¶ 272} "3315.40 to 3315.42 Requirements related to establishing and maintaining a school district education foundation fund.

{¶ 273} "3317.01 Requirements for the receipt of state education funds, including levying 20 mills, providing instruction for the minimum number of school days, and paying teachers according to the state minimum teachers salary schedule; requirement to comply with all school law and State Board rules in order to participate in the state basic aid funding program.

{¶ 274} "3317.011 to 3317.0213 Requirements that school districts be paid specified amounts of state funds (section 3314.08 establishes a method of calculating the amount of state funding for community schools.)

{¶ 275} "3317.022(C)(5) Requirement that a school district spend the total amount of per pupil state funding (formula and weighted additional amounts) it receives for disabled students on special education and related services for those students.

{¶ 276} "3317.023(B) and (C) Requirement that a school district's districtwide pupil to teacher ratio be no more than 25 to 1.

{¶ 277} "3317.023(D) Requirement that a school district employ five full-time-equivalent educational service personnel (including elementary school art, music, and physical education teachers, counselors, librarians, visiting teachers, school social workers, and school nurses) for each 1,000 pupils in the regular student population.

{¶ 278} "3317.029 Spending restrictions on disadvantaged pupil impact aid (DPIA).

{¶ 279} "3317.03 and 3317.033 Requirements related to reporting school average daily membership and maintaining school records (except that under R.C.

3314.08, in order to receive state payments, community schools must report the number of students enrolled.)

{¶ 280} "3317.04 Funding requirements related to the transfer of school district territory or the consolidation of districts.

{¶ 281} "3317.06 Funding, requirements, and prohibitions related to auxiliary services for chartered nonpublic schools.

{¶ 282} "3317.061 Requirement to annually report licensed employees to the State Board.

{¶ 283} "3317.07 Funding for school bus purchases.

{¶ 284} "3317.08 to 3317.082 Tuition calculation requirements.

{¶ 285} "3317.11 Requirements to receive services from an educational service center (formerly county school boards.)

{¶ 286} "3317.12 Nonteaching employee salary schedule requirement.

{¶ 287} "3317.13 State minimum teachers salary schedule requirement.

{¶ 288} "3317.14 School district teachers salary schedule requirement.

{¶ 289} "3317.15 Requirements specifying the number of speech-language pathologists and school psychologists a school district must hire.

{¶ 290} "3317.62 to 3317.64 Requirements related to loans from the lottery profits education fund under certain circumstances.

{¶ 291} "Chapter 3318. School Facilities Assistance Law (except for a program under which community school loans for classroom facilities may be guaranteed by the state for up to 15 years (R.C. 3318.50).)

{¶ 292} "3319.01 and 3319.011 Requirements related to school superintendent employment.

{¶ 293} "3319.02 Requirements related to employment of assistant superintendents, principals, assistant principals, and other administrators.

{¶ 294} "3319.03 to 3319.06 Requirements related to employment of school district business managers.

{¶ 295} "3319.07, 3319.08, and 3319.09 to 3319.111 Teacher employment and contract requirements.

{¶ 296} "3319.071 Prohibition against requiring teachers to participate in professional development programs.

{¶ 297} "3319.072 Teacher lunch period requirement.

{¶ 298} "3319.081 to 3319.087 Employment requirements for nonteaching employees.

{¶ 299} "3319.088 Educational aide employment requirements.

{¶ 300} "3319.10 Substitute teacher employment requirements.

{¶ 301} "3319.12 Annual professional staff salary notice requirements; requirements related to the transfer of administrators to other positions.

{¶ 302} "3319.13 to 3319.143 Leave of absence requirements for teachers and nonteaching employees, including professional development leave, sick leave, military leave, personal leave, and assault leave.

{¶ 303} "3319.15 Teacher termination of contract requirements.

{¶ 304} "3319.16 and 3319.161 School board termination of teacher contract requirements.

{¶ 305} "3319.17 Reduction in teaching force requirements.

{¶ 306} "3319.171 Requirements related to administrative personnel suspension policy.

{¶ 307} "3319.18 and 3319.181 Requirements related to employment of teachers and nonteaching employees when school district territory is transferred or districts are consolidated.

{¶ 308} "3319.21 Prohibition against a school board participating in a contract employing a relative of a school board member; requirement that these contracts and any contracts in which a board member has a pecuniary interest are void.

{¶ 309} "3319.32 Student record keeping requirements.

{¶ 310} "3319.322 Student photograph requirements for student records.

{¶ 311} "3319.33 Statistical reporting requirements to the State Board.

{¶ 312} "3319.35 and 3319.37 Penalties and consequences for failure to submit reports to the State Board.

{¶ 313} "3319.36 Prohibition against paying a nonlicensed teacher (except R.C. 3314.03(A)(10) requires teachers in community schools to be licensed under sections 3319.22–3319.31.)

{¶ 314} "3319.41 School corporal punishment policy requirements and authorization.

{¶ 315} "3319.45 Requirement that school principal report certain offenses committed by students.

{¶ 316} "3321.02 to 3321.12 Requirements related to the enforcement of student compulsory attendance law; requirements related to students with age and schooling certificates.

{¶ 317} "Chapter 3324. Identification of gifted children and development of service plan.

{¶ 318} "3327.01 to 33276.05 Student transportation requirements (Sections 3314.09 and 3314.091 require a school district to transport its students to

community schools in the same manner districts are required to transport students to other schools unless the district has entered into an agreement with a community school under which the community school provides student transportation.)

{¶ 319} "3327.06 Tuition collection requirements and provisions related to the unauthorized attendance of students.

{¶ 320} "3327.08 Competitive Bidding Law regarding school bus purposes

{¶ 321} "3327.09 Motor vehicle insurance requirement (though community schools must provide for liability insurance (R.C. 3314.03(A)(11)(b))).

{¶ 322} "3327.11 Requirements related to paying the cost of a student's room and board in certain circumstances.

{¶ 323} "3327.13 Requirements related to leasing buses for transporting non-public school students to and from school activities.

{¶ 324} "3327.14 Requirements related to providing transportation for senior citizen and adult education group.

{¶ 325} "3327.15 Restrictions on use of school vehicles out of state.

{¶ 326} "3327.16 Requirements related to volunteer bus rider assistance programs; requirement to provide school bus rider instruction programs.

{¶ 327} "3329.01 to 3329.08 All requirements related to the selection and purchase of school textbooks and electronic textbooks.

{¶ 328} "3329.09 Requirements related to the accessibility and distribution of textbooks to students (except the parent's right to buy textbooks for a child at no more than 10% over the school district's cost applies.)

{¶ 329} "3329.10 Prohibition against a superintendent, supervisor, principal, or teacher acting as a school textbook sales agent.

{¶ 330} "Chapter 3331. Requirements related to the issuing and administration of age and schooling certificates (except the parental right, under 3331.13, to obtain a child's school records upon request for purposes of an age and schooling certificate applies.)

{¶ 331} "Title 35 (various sections) Elections Law related to school board elections and elections on tax levies and bond issues.

{¶ 332} "4104.05(A) and (B) Requirement to employ a licensed boiler operator under certain circumstances unless, this requirement is considered to be a facility safety issue.

{¶ 333} "5705.412 Requirement to attach certificate of available resources to school district appropriation measures, contracts, and purchase orders."

Ulmer Berne, L.L.P., and Donald J. Mooney Jr., for appellants and cross-appellees.

Jim Petro, Attorney General, Douglas R. Cole, State Solicitor, Stephen P. Carney, Senior Deputy Solicitor, and Roger F. Carroll, Assistant Attorney General, for state appellees and cross-appellants.

Jones Day, Fordham E. Huffman, and Chad A. Readler, for community-school appellees and cross-appellants.

Isaac, Brandt, Ledman & Teetor, L.L.P., David G. Jennings, and Mark Landes, for appellee University of Toledo Charter School Council.

Chester, Willcox & Saxbe, L.L.P., Donald C. Brey, and Charles R. Saxbe; Brennan, Manna & Diamond, L.L.C., John B. Schomer, and Leigh A. Maxa, for appellee and cross-appellant White Hat Management.

Louis B. Geneva Co., L.P.A., and M. Jayne H. Geneva, supporting appellants and cross-appellees for amici curiae Coalition for School Funding Reform, Community Advocates for Public Education, Cleveland Heights–University Heights City School District, Lakewood City School District, and Shaker Heights City School District.

Rachelle Johnson, supporting appellants and cross-appellees for amicus curiae Ohio Education Association.

Carpenter & Lipps, L.L.P., Jeffrey A. Lipps, and Michael N. Beekhuizen, supporting appellees and cross-appellants for amicus curiae Buckeye Community Hope Foundation.

McNamara, Hanrahan, Callender & Loxterman, James S. Callender Jr., and Sheila M. Sexton, supporting appellees and cross-appellants for amici curiae Ohio Counsel of Community Schools, Lucas County Educational Service Center, Reynoldsburg Board of Education, Ashe Cultural Center, and National Association of Charter School Authorizers.

Nicola, Gudbranson & Cooper, L.L.C., Timothy L. McGarry, Arthur L. Clements III, and Becky M. Scheiman, supporting appellees and cross-appellants for amici curiae parent-teacher organizations of the following schools: Hope Academy–Canton Campus; Hope Academy–University Campus; Parma Community School; Summit Academy–Akron; Summit Academy–Dayton; Summit Academy–Parma; W.E.B. DuBois Academy; Ohio Coalition of E School Families, Inc.; Summit Academy–Xenia; and The Edge Academy.

Porter, Wright, Morris & Arthur, James B. Hadden, and Anne M. Hughes, supporting appellees and cross-appellants for amici curiae Charter School Leadership Council, Alliance for School Choice, Thomas B. Fordham Institute, and state charter-school organizations.

Bricker & Eckler, L.L.P., Susan B. Greenberger, Anne Marie Sferra, and Jennifer A. Flint, not in support of the position of any party for amicus curiae Tri–Rivers Educational Computer Association.